U.S. Bank, National Association,
As Legal Title Trustee for Truman
2016 SC6 Title Trust,

| | | |
|---|---|---|
| | Plaintiff, | 6:26-CV-0070 |
| v. | | (MAD/MJK) |

Carmine P. Amelio, Paul A. Amelio,
Alfonso Amelio, Mortgage
Electronic Registration Systems, Inc.,
Quicken Loans, Inc., et al.,

Defendants.

Carmine P. Amelio, Paul A. Amelio, and
Alfonso Amelio, *pro se* Defendants

Sean K. Monahan, Esq., for Plaintiffs

Mitchell J. Katz, U.S. Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

Currently before the Court is Defendants' recusal motion under 28

U.S.C. §§ 144, 455(a) and 455(b)(4). (Dkt. 31). Defendants also request

"that the Order and Report-Recommendation (Dkt. No. 25) be held in

abeyance and not acted upon until this motion is decided." (*Id.*).

Plaintiff opposes Defendants' motion. (Dkt. 35). For the reasons stated

below, Defendants' motion is denied.

1

## I.  DISCUSSION

Defendants claim that I should recuse myself from this case because of financial conflicts and a purported bias reflected in the Court's March 17, 2026, Order and Report-Recommendation. (Dkt. 25). Defendants' motion is denied because: (1) it is moot; (2) my ownership of the mutual funds and common investment funds identified by them are specifically excluded from the definition of "financial interest" unless I participate in the management of those funds, which I do not; and (3) the Order and Report-Recommendation was not based on bias, favoritism or antagonism toward defendants. *See* 28 U.S.C. §§ 455(a), (b)(1) and (d)(4)(i).

### A. Defendants' motion is denied as moot.

As an initial matter, Defendants' motion is moot. On May 22, 2026, U.S. District Court Judge Mae A. D'Agostino adopted this Court's Order and Report-Recommendation dismissing the notice of removal with prejudice. (Dkt. 34). In its decision, the District Court specifically denied Defendants' request to hold the Order and Report-Recommendation in abeyance pending a determination of this motion. (Dkt. 34, pg. 5). The only issues left unresolved in the District Court's May 22, 2026, Memorandum-Decision and Order are the imposition of

2

sanctions and a referral to Chief United States District Court Judge Brenda K. Sannes "for a potential injunction on future filings related to the underlying state-court action." (Dkt. 34, pg. 20). Because the District Court has already accepted this Court's Order and Report-Recommendation, as modified, Defendants' motion for recusal is moot. Nevertheless, I address the further grounds upon which the recusal motion is based.

**B. Defendants' recusal motion under 28 U.S.C. § 455(b)(4) is denied.**

Defendants claim that I should recuse myself from this action because of my ownership of Vanguard Funds, other financial sector funds, as well as personal bank accounts in varying banking institutions. My financial portfolio does not provide a valid legal basis to seek recusal. (Dkt. 31, pgs. 2-5).

United States Code Title 28, Section 455(b)(4) requires a judge to recuse themself if they have "a financial interest in the subject matter in controversy or in a party to the proceeding[.]" 28 U.S.C. § 455(b)(4). Ownership of a mutual or common investment fund that holds securities is specifically excluded from the definition of "financial interest," unless the judge participates in the management of the fund.

28 USCA § 455(d)(4)(i); *see also Bryan v City of New York*, No. 22-CV-2234, 2025 WL 917826, at *1 (E.D.N.Y. Mar. 25, 2025); *United States v Watson*, No. 23-CR-0082, 2024 WL 4827734, at *4 (E.D.N.Y. Nov. 19, 2024). There are no allegations in Defendants' motion that I have direct ownership in Plaintiff, and for good reason. I do not have a direct ownership interest in Plaintiff. Further, there are no allegations in Defendants' motion that I participate in the management of the funds that I own, and for good reason: I do not participate in the management of the funds that I own. Defendants' motion to recuse on this basis is denied.

### C. Defendants' recusal motion under 28 U.S.C. § 455(a) is denied.

Defendants' motion seeking recusal based on the Court's Order and Report-Recommendation is also denied.

A federal judge must recuse themself in any proceeding where "[their] impartiality might reasonably be questioned" or they have "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ." *See* 28 U.S.C. §§ 455(a), 455(b)(1). In cases where a judge's impartiality might reasonably be questioned, the issue for consideration is not whether the

judge is in fact subjectively impartial, but whether the objective facts suggest impartiality. *See Liteky v. United States*, 510 U.S. 540, 548 (1994). The ultimate inquiry is whether "a reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality could reasonably be questioned." *Hughes v. City of Albany*, 33 F. Supp. 2d 152, 153 (N.D.N.Y. 1999) (alteration in original) (quoting *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992)), *aff'd*, 189 F.3d 461 (2d Cir. 1999). However, a judge "is as much obliged not to recuse [themself] when it is not called for as [they are] obliged when it is." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988) (citation omitted).

Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See Liteky*, 510 U.S. at 555; *see also Schiff v. United States*, 919 F.2d 830, 834 (2d Cir 1990) (*per curiam*). They are proper grounds for appeal, not recusal. *Liteky*, 510 U.S. at 555. Similarly, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would

make fair judgment impossible." *Id.* "[J]udicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* There is nothing in the Order and Report-Recommendation that reflects a bias, favoritism or antagonism toward the defendants. The Order and Report-Recommendation reflects an assessment of the facts and law, and nothing more.

Defendants' arguments that I should recuse myself reflect their obvious disagreement with the Order and Report-Recommendation. Their remedy was to file objections with the District Court, which they did. (Dkt. 30). U.S. District Court Judge Mae A. D'Agostino evaluated and ruled on Defendants' objections in her May 22, 2026, Memorandum-Decision and Order. (Dkt. 34). The motion to recuse on this ground is likewise denied.

## II. CONCLUSION

**WHEREFORE**, based on the findings above, it is hereby

**ORDERED**, that Defendants' motion (Dkt. 31) seeking the recusal of Magistrate Judge Mitchell J. Katz is **DENIED**, and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on all Defendants by regular mail, and it is further

**ORDERED** that the Clerk provide the Defendants with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (*per curiam*).

Dated: June 18, 2026.

Hon. Mitchell J. Katz
U.S. Magistrate Judge

**Bryan v. City of New York, Not Reported in Fed. Supp. (2025)**

2025 WL 917826

2025 WL 917826
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Amoura BRYAN, Plaintiff,
v.
CITY OF NEW YORK et al., Defendants.

22-cv-2234(EK)(LB)
|
Signed March 25, 2025

**Attorneys and Law Firms**

Jo Saint-George, Esq., Women of Color for Equal Justice, Gaithersburg, MD, for Plaintiff.

Amoura Bryan, Newark, NJ, Pro Se.

Elisheva Leah Rosen, New York City Law Department, New York, NY, for Defendants.

### MEMORANDUM & ORDER

ERIC KOMITEE, United States District Judge:

**\*1** This case was initially filed as a putative class action challenging several New York City orders requiring City employees to receive COVID-19 vaccinations. *See* Fourth Am. Compl., ECF No. 88; Orders, ECF Nos. 17-19 to 17-27. On September 25, 2024, this Court granted Defendants' motion to dismiss all claims except for Plaintiff Amoura Bryan's Title VII and New York City Human Rights Law claims. *See* Mem. & Order, ECF No. 99. Bryan alleged that Defendants failed to accommodate her religious objection to receiving the COVID-19 vaccination, which was mandatory for New York City employees. *Id.* at 19-20, 22-23. [1]

[1] As Ms. Bryan is the only remaining plaintiff, the Clerk of Court is respectfully directed to amend the case caption as indicated above.

Following the decision on the motion to dismiss, class counsel sought to withdraw from representing Ms. Bryan. *See* Mot. to Withdraw, ECF No. 102; Saint-George Decl., ECF No. 106. After Ms. Bryan indicated that she did not wish to be represented by that counsel, the Court permitted counsel's withdrawal. *See* Let., ECF No. 107; Oct. 30, 2024 Order. Class counsel has continued to represent all other (now

dismissed) plaintiffs. *See, e.g.*, Mot. for Misjoinder, ECF No. 120.

Class counsel has filed a motion seeking the Court's disqualification under 28 U.S.C. § 455. *See* Mot. for Recusal, ECF No. 110. Defendants have also sought reconsideration of the Court's ruling on Ms. Bryan's claims. *See* Mot. for Reconsider., ECF No. 100. Ms. Bryan has responded, now representing herself. *See* ECF No. 121. For the following reasons, the motion for disqualification is denied, and the motion for reconsideration is granted. This case will be dismissed.

### I. Disqualification is Denied

The precise basis for the motion for recusal is difficult to discern, but it cites my supposed "extrajudicial involvement in the commercialization" of "the Moderna Technology mRNA vaccine." Mot. for Recusal 2. The motion also invokes my "financial equity ownership in Moderna" through a fund managed by my former employer. *Id.* [2] The motion is denied.

[2] The motion also alleges that the Court's "dismissal of Plaintiffs' individual fraud claims against Mayor Adams after his indictment looks like a cover-up and appears that your may [sic] have been bribed to dismiss Plaintiffs [sic] case against Mayor Adams to also cover up your own self-dealing in this case because [etc.]." Mot. for Recusal 3. This assertion does not warrant a response.

First, Section 455(d)(4) provides a safe harbor for securities held through a "mutual or common investment fund," and that provision applies here. Plaintiffs do not point to any direct investment in Moderna (and I have made none). Instead, the motion speaks to my "equity ownership in Moderna through [my] ownership of Viking [Global] Equities," which is a diversified investment fund. *See generally United States v. Watson,* No. 23-CR-82, 2024 WL 4827734, at *8-11 (E.D.N.Y. Nov. 19, 2024).

The disqualification motion points to a press release indicating that one or more funds managed by my former employer invested in Moderna in early 2018, when it was still a private company. Moderna went public in December 2018, well before the pandemic. Thus, by the time of a COVID vaccine's development, any interest I *might have had* in Moderna would have been indirect: an investment

**Bryan v. City of New York, Not Reported in Fed. Supp. (2025)**

2025 WL 917826

in a common investment fund that, in turn, held shares in a publicly traded company. This is no different than mutual fund ownership, and it is well settled that no recusal obligation arises in these circumstances.

**\*2** In any event, the motion does not describe how this litigation, which began in 2022, might even theoretically have affected the value of Moderna's stock. Moderna is not a party here. Nor is it alleged to be a victim. And the vaccine mandates that the complaint challenged have long since expired. *See* Order of the Board of Health to Amend the Requirement for COVID-19 Vaccination for City Employees and Employees of Certain City Contractors (repealing vaccination requirements on Feb. 9, 2023); Order of the Board of Health Amending COVID-19 Vaccination Requirements for Department of Education Employees, Contractors, Visitors and Others (same).

The motion also nods in the direction of Section 455(a)'s general provision regarding the appearance of partiality. But it is settled that, when the safe harbor of Section 455(d) applies, Section 455(a) cannot be used to circumvent it in respect of an investment in a common investment fund. *See Liteky v. United States,* 510 U.S. 540, 552 (1994)*; New York City Dev. Corp. v. Hart,* 796 F.2d 976, 980 (7th Cir. 1986). [3]

3    Finally, Plaintiffs allege that I should recuse because I did not investigate and sanction defense counsel for "fraud on the Court." Mot. for Recusal 18. But defense counsel did no such thing. Plaintiffs merely disagree with the Defendants' position that the Occupational Safety and Health Act lacks a private right of action. *See id.* In the Order on the motion to dismiss, I agreed with Defendants. Mem. & Order 10, ECF No. 99. And "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555.

Thus, the motion for recusal is denied. Plaintiffs also filed a motion to vacate the Order adjudicating the motion to dismiss, contingent on the Court granting the motion for recusal. *See* Mot. to Vacate 30, ECF No. 109. As the latter is denied, the former is as well.

## II. Reconsideration is Granted

The standard for granting a motion for reconsideration is strict. "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). [4]

4    Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

Defendants do indeed point to such data. They assert that Ms. Bryan's remaining Title VII and New York City Human Rights Law ("NYCHRL") claims are barred by the doctrine of *res judicata* because of a previously adjudicated case in which she was a plaintiff. Under that doctrine, a plaintiff is precluded from relitigating claims where "(1) the previous action involved an adjudication of the merits; (2) the previous action involved the same plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000).

The case the Defendants cite satisfies these conditions. Amidst the hundreds of pages comprising multiple complaints, exhibits, and briefs, Defendants had referenced Ms. Bryan's participation in *Kane v. De Blasio*, 623 F. Supp. 3d 339 (S.D.N.Y. 2022), *aff'd in part, vacated in part, remanded sub nom. New Yorkers For Religious Liberty, Inc. v. City of New York*, 121 F.4th 448 (2d Cir. 2024), and *aff'd in part, vacated in part, remanded sub nom. New Yorkers for Religious Liberty, Inc. v. New York*, 125 F.4th 319 (2d Cir. 2024). [5]

5    *Kane* was consolidated with *Keil v. City of New York,* No. 21-cv-8773 (S.D.N.Y.) on December 14, 2021. *See* Order, Dec. 14, 2021, ECF No. 90. Additionally, the vacated sections of the *Kane* district court opinion are not applicable to Ms. Bryan. *See New Yorkers for Religious Liberty,* 125 F.4th at 334-35 (reversing denial of two plaintiffs' as-applied challenges to the vaccine mandates). Ms. Bryan was also a plaintiff in *Broecker v. N.Y. City Dep't. of Educ.*, No. 21-CV-6387, 2023 WL 2710245 (E.D.N.Y. 2023), *aff'd* 2023 WL 8888588 (2d Cir. 2023); and *Matter of Bryan v. Board of Education of the City School District of the City of N.Y.,* 222 A.D.3d 473 (N.Y. App. Div. 1st Dep't

**Bryan v. City of New York, Not Reported in Fed. Supp. (2025)**

2025 WL 917826

2023). However, the Court need not analyze all three cases for *res judicata* — one is sufficient.

**\*3** Ms. Bryan acknowledges that she was a plaintiff in *Kane.* *See* Opp'n 3; *see also* Consolidated Am. Compl. ¶ 38, *Kane, 623 F. Supp. 3d 339 (No. 21-cv-7863),* ECF No. 102 (showing Ms. Bryan as a named plaintiff); *New Yorkers for Religious Liberty,* 125 F.4th at 325 n.1 (identifying Ms. Bryan as a plaintiff).

*Kane* adjudicated all federal claims on the merits: they were dismissed with prejudice. *See Kane, 623 F. Supp. 3d at 364.* "A dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action." *Samuels v. N. Telecom, Inc., 942 F.2d 834, 836 (2d Cir. 1991).* Plaintiffs also brought a NYCHRL claim in *Kane. See* Consolidated Am. Compl. ¶¶ 929-42. However, the Court declined to exercise supplemental jurisdiction over state law claims, which is a dismissal without prejudice. *See Kane, 623 F. Supp. 3d at 364; Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, (1988).*

Ms. Bryan had brought a Title VII claim in *Kane.* The *Kane* consolidated amended complaint did not include an explicit claim for relief under Title VII. However, it contained a cause of action for "Violation of Amoura Bryan's Constitutional and Statutory Rights," and discussed Title VII at length. *See* Consolidated Am. Compl. ¶¶ 894-95 (Bryan claim); *id.* ¶¶ 101, 132, 139, 155, 202, 803, 817, 936, 939-40, 949, 952 (Title VII). In turn, the *Kane* court adjudicated Ms. Bryan's claim pursuant to Title VII. *See Kane, 623 F. Supp. 3d at 362-63.*

Plaintiff's Title VII claim here is virtually identical to that in *Kane.* In both cases, she alleged that a) compulsory COVID-19 vaccination conflicted with her sincerely held religious beliefs; and b) she was denied reasonable accommodations from the City's vaccine mandates. *See* Mem.

& Order 19-20; Consolidated Am. Compl. ¶¶ 690-731. *Kane* also addresses one of the same City mandate orders as discussed in the case here. *See* Mem. & Order 3; *Kane, 623 F. Supp. 3d at 347.*

Moreover, though *Kane* was not an adjudication of Ms. Bryan's NYCHRL claim on the merits, her NYCHRL claim in this action is still barred by *res judicata.* "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Monahan,* 214 F.3d at 28. Ms. Bryan's *Kane* Title VII claim arises from the identical transaction as her NYCHRL claim does here: her religious objection to COVID-19 vaccination and denial of accommodations from the mandates. Indeed, in *Kane,* Bryan alleged a more detailed version of the facts than emerged here; the essential facts were present in the earlier action, and she has made the same NYCHRL claim twice in federal court. *See* Mem. & Order 22-23; Consolidated Am. Compl. ¶¶ 690-731; *see also Twersky v. Yeshiva Univ., 112 F. Supp. 3d 173, 179-80 (S.D.N.Y. 2015), aff'd sub nom. Gutman v. Yeshiva Univ., 637 F. App'x 48 (2d Cir. 2016)* (finding that plaintiffs' NYCHRL and N.Y. Social Services Law claims were barred by their Title IX claim in a prior action).

**\*4** Therefore, Ms. Bryan's Title VII and NYCHRL claims are barred by *res judicata.* The Court need not reach Defendants' other arguments for reconsideration, as all claims against Defendants are dismissed.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2025 WL 917826

---

**End of Document**　　　　　　　　　　© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (8)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Class Action Complaint for Damages, Declaratory and Injunctive Relief and Jury Demand** <br> WOMEN OF COLOR FOR EQUAL JUSTICE; Remo Dello Ioio, Elizbeth Loiacono, Suzanne Deegan, Maritza Romero, Julia. Harding, Christine O'reilly, Ayse P. Ustares, Sara Coombs-Moreno, Jesus Coombs, Angela Velez, Sancha Brown, Amoura Bryan, Zena Wouadjou, Charisse Ridulfo, Tracy-Ann Francis Martin, Kareem Campbell, Michelle Hemmings Harrington, Mark Ayne, Carla Grant, Ophela Inniss, Cassandra Chandler, Aura Moody, Evelyn Zapata, Sean Milan, Sonia Hernandez, Bruce Reid, Joseph Rullo, and Curtis Boyce, individually and on behalf of similarly situated individuals, Plaintiffs, v. THE CITY OF NEW YORK, Mayor Eric L. Adams Department of Health and Mental Hygiene, Defendant. <br> 2022 WL 1176878 | — | E.D.N.Y. | Apr. 19, 2022 | Pleading |
| **2. Memorandum of Law in Support of Plaintiffs Motion to Vacate Under Rule 60(b)(2)(3)(6)** <br> Sara COOMS, et al., Plaintiffs, v. THE CITY OF NEW YORK, Mayor Eric L. Adams, Comissioner Ashwin Vasan, MD, PHD Department of Health and Mental Hygiene, Department of Education, And Does 1-20, Defendants. <br> 2024 WL 5672252 | — | E.D.N.Y. | Oct. 25, 2024 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **3. Reply F.R.C.P. Rule 60(a) Motion to Amend the January 10, 2024 Order and Vacate the February 14, 2024 Order to Correct for Inadvertent Errors Arising from Oversight or Omission**<br>Sara COOMBS-MORENO, Remo Dello Ioio, Elizbeth Loiacono, Suzanne Deegan, Maritza Romero, Julia Harding, Christine O'reilly, Ayse P. Ustares, Jesus Coombs, Angela Velez, Sancha Browne, Amoura Bryan, Zena Wouadjou, Charisse Ridulfo, Tracy-ann Francis Martin, Kareem Campbell, Michelle Hemmings Harrington, Mark Mayne, Carla Grant, Ophela Inniss, Cassandra Chandler, Aura Moody, Evelyn Zapata, Sean Milan, Sonia Hernandez, Bruce Reid, Joseph Rullo, And Curtis Boyce, Josesph Saviano, Monique More, Natalya Hogan, Jessica Csepku, Roseanne Mustacchia, Yulonda Smith, Maria Figaro, Rasheen Odom, Frankie Trotman, Edward Weber, Mervilyn Wallen, Paula Smith, Christian Murillo, Lyndsay Wanser, Joseph Saviano, Marvilyn Wallen, Christian Murillo, Dawn Schol, Suzanne Schroeter, Sarah Wiesel, Althea Brissett, Tracey Howard, Marc Rosiello, Audrey Dennis, Marie Joseph, Patricia Catoire, Sally Mussafi, Colette Caesar, Bertram Scott, Diane Pagen, Stella M. Preston, Rachelle Garcia, Julie Lawley, Susanne Phillip, Maria Estrada, Jennette Frazer, and Debby Hartz individually and on behalf of similarly situated individuals, Plaintiffs, v. THE CITY OF NEW YORK, Mayor Eric L. Adams, Former Mayor Bill deBLASIO, Comissioner Ashwin Vasan, MD, PHD, AND Former Commissioner Dave A. Chokshi, M.D., MSC., Department of Healthand Mental Hygiene, Department of Education and Does 1-20, Defendants.<br>2024 WL 3378412 | — | E.D.N.Y. | Feb. 23, 2024 | Motion |

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **4. F.R.C.P. Rule 60(a) Motion to Amend the January 10, 2024 Order and Vacate the February 14, 2024 Order to Correct for Inadvertent Errors Arising from Oversight or Omission**<br>Sara COOMBS-MORENO, Remo Dello Ioio, Elizbeth Loiacono, Suzanne Deegan, Maritza Romero, Julia Harding, Christine O'reilly, Ayse P. Ustares, Jesus Coombs, Angela Velez, Sancha Browne, Amoura Bryan, Zena Wouadjou, Charisse Ridulfo, Tracy-ann Francis Martin, Kareem Campbell, Michelle Hemmings Harrington, Mark Mayne, Carla Grant, Ophela Inniss, Cassandra Chandler, Aura Moody, Evelyn Zapata, Sean Milan, Sonia Hernandez, Bruce Reid, Joseph Rullo, And Curtis Boyce, Josesph Saviano, Monique More, Natalya Hogan, Jessica Csepku, Roseanne Mustacchia, Yulonda Smith, Maria Figaro, Rasheen Odom, Frankie Trotman, Edward Weber, Mervilyn Wallen, Paula Smith, Christian Murillo, Lyndsay Wanser, Joseph Saviano, Marvilyn Wallen, Christian Murillo, Dawn Schol, Suzanne Schroeter, Sarah Wiesel, Althea Brissett, Tracey Howard, Marc Rosiello, Audrey Dennis, Marie Joseph, Patricia Catoire, Sally Mussafi, Colette Caesar, Bertram Scott, Diane Pagen, Stella M. Preston, Rachelle Garcia, Julie Lawley, Susanne Phillip, Maria Estrada, Jennette Frazer, and Debby Hartz individually and on behalf of similarly situated individuals, Plaintiffs, v. THE CITY OF NEW YORK, MAYOR ERIC L. ADAMS, Former Mayor Bill deBLASIO, Comissioner Ashwin Vasan, MD, PHD, and Former Commissioner Dave A. Chokshi, M.D., MSC., Department of Health and Mental Hygiene, Department of Education and Does 1-20, Defendants.<br>2024 WL 3378414 | — | E.D.N.Y. | Feb. 19, 2024 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **5. Plaintiffs' Renewed Motion for Temporary Restraining Order, Preliminary Injunction and Preliminary/Conditional Class Certification** <br> WOMEN OF COLOR FOR EQUAL JUSTICE, Remo Dello Ioio, Elizbeth Loiacono, Suzanne Deegan, Maritza Romero, Julia. Harding, Christine O'Reilly, Ayse P. Ustares, Sara Coombs-Moreno, Jesus Coombs, Angela Velez, Sancha Browne, Amoura Bryan, Zena Wouadjou, Charisse Ridulfo, Tracyann Francis Martin, Kareem Campbell, Michelle Hemmings Harrington, Mark Mayne, Carla Grant, Ophela Inniss, Cassandra Chandler, Aura Moody, Evelyn Zapata, Sean Milan, Sonia Hernandez, Bruce Reid, Joseph Rullo, and Curtis Boyce, Josesph Saviano, Monique More, Natalya Hogan, Jessica Csepku, Roseanne Mustacchia, Yulonda Smith, Maria Figaro, Rasheen Odom, Frankie Trotman, Georgiann Gratsley, Edward Weber, Mervilyn Wallen, Paula Smith, Sarah Wiesel Suzanne Schroeter, Dawn Schol, Lyndsay Wanser, Christian Murillo, individually and on behalf of similarly situated individuals, Plaintiffs, v. THE CITY OF NEW YORK, Mayor Eric L. Adams, Comissioner Ashwin Vasan, MD, PHD Department of Health and Mental Hygiene, Department of Education, and Does 1-20, Defendants. <br> 2022 WL 18142293 | — | E.D.N.Y. | Oct. 26, 2022 | Motion |
| **6. Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction** <br> WOMEN OF COLOR FOR EQUAL JUSTICE, Remo Dello Ioio, Elizbeth Loiacono, Suzanne Deegan, Maritza Romero, Julia. Harding, Christine O'Reilly, Ayse P. Ustares, Sara Coombs-Moreno, Jesus Coombs, Angela Velez, Sancha Browne, Amoura Bryan, Zena Wouadjou, Charisse Ridulfo, Tracyann Francis Martin, Kareem Campbell, Michelle Hemmings Harrington, Mark Mayne, Carla Grant, Ophela Inniss, Cassandra Chandler, Aura Moody, Evelyn Zapata, Sean Milan, Sonia Hernandez, Bruce Reid, Joseph Rullo, and Curtis Boyce, Josesph Saviano, Monique More, Natalya Hogan, Jessica Csepku, Roseanne Mustacchia, Yulonda Smith, Maria Figaro, Rasheen Odom, Frankie Trotman, Georgiann Gratsley, Edward Weber, Mervilyn Wallen, Paula Smith individually and on behalf of similarly situated individuals, Plaintiffs, v. THE CITY OF NEW YORK, Mayor Eric L. Adams, Comissioner Ashwin Vasan, MD, PhD Department of Health and Mental Hygiene, Department of Education, and Does 1-20, Defendants. <br> 2022 WL 18142288 | — | E.D.N.Y. | Sep. 02, 2022 | Motion |
| **7. Expert Resume of Baxter Delworth Montgomery** <br> Dr. Baxter Delworth Montgomery, M.D. <br> 2023 WL 4824718 | — | E.D.N.Y. | Apr. 03, 2023 | Expert Resume |
| **8. Expert Resume of Bruce Miller** <br> Bruce Miller, B.S., M.S., A.A.S., CIH <br> 2023 WL 4824720 | — | E.D.N.Y. | Apr. 03, 2023 | Expert Resume |

**History (6)**

**Direct History (3)**

🚩 1. Coombs-Moreno v. City of New York
2024 WL 4287247 , E.D.N.Y. , Sep. 25, 2024

*On Reconsideration in Part*

2. Bryan v. City of New York 👓
2025 WL 917826 , E.D.N.Y. , Mar. 25, 2025

*AND Affirmed by*

3. Ioio v. City of New York
2026 WL 731089 , 2nd Cir.(N.Y.) , Mar. 16, 2026

**Related References (3)**
4. Women of Color for Equal Justice v. City of New York
2022 WL 17083109 , E.D.N.Y. , Nov. 18, 2022

*Application Denied by*

5. Women of Color for Equal Justice v. City of New York, New York
2023 WL 5728522 , U.S. , Apr. 25, 2023

*AND Application Denied by*

6. Women of Color For Equal Justice v. City of New York, New York
143 S.Ct. 2490 , U.S. , May 22, 2023

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4827734
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

UNITED STATES of America,
v.
Carlos WATSON and Ozy Media, Inc., Defendants.

23-CR-0082(EK)
|
Signed November 19, 2024

**Attorneys and Law Firms**

Dylan Alexander Stern, Frank Turner Buford, Government Attorneys, Department of Justice, U.S. Attorney's Office, Brooklyn, NY, Gillian Kassner, Government Attorney, DOJ-USAO, Criminal Division, Brooklyn, NY, Jonathan Siegel, Joshua Buchanan Dugan, Government Attorneys, U.S. Attorney's Office, Brooklyn, NY, for United States of America.

Andrew James Frisch, The Law Offices of Andrew J. Frisch PLLC, New York, NY, Ronald S. Sullivan, Pro Hac Vice, Janine M. Gilbert, Ronald Sullivan Law Firm PLLC, Washington, DC, William Anthony Burck, Quinn Emanuel Urquhart & Sullivan, Washington, DC, for Defendant Carlos Watson.

Andrew James Frisch, The Law Offices of Andrew J. Frisch PLLC, New York, NY, Kenneth Jamal Montgomery, Kenneth J. Montgomery PLLC, Brooklyn, NY, Shannon Frison, Pro Hac Vice, Frison Law Firm, P.C., Boston, MA, for Defendant Ozy Media, Inc.

## <u>MEMORANDUM & ORDER</u>

ERIC KOMITEE, United States District Judge:

**\*1** A grand jury sitting in this district indicted Carlos Watson and his company, Ozy Media, in February of 2023. The indictment charged both Defendants with conspiring to commit securities fraud and wire fraud, and Watson with aggravated identity theft. After fifteen months of discovery, motion practice, and other pretrial activity, trial commenced on May 29, 2024. Approximately six weeks later, the jury convicted both Defendants on all counts.

Defendants now move to disqualify me as the presiding judge. They also seek vacatur of their convictions and dismissal of the indictment, or alternatively, a new trial before a different judge. The motion is primarily predicated on a long chain. Defendants observe that: (1) I maintain investments in four diversified investment funds, including two managed by my previous employer, Viking Global Investors LP; (2) at various times relevant to this case, those funds held positions in four publicly traded companies — Alphabet (Google), JPMorgan Chase, Goldman Sachs, and Live Nation; (3) some of those publicly traded companies (but not all four) *contemplated* investing in Ozy Media; but (4) *none* ever did. On this attenuated basis, Defendants argue that my interest in these diversified investment funds creates a financial conflict that requires recusal.

The motion is long on innuendo but decidedly short on substance. More importantly, it is both (a) untimely and (b) squarely foreclosed by the applicable statute and long-standing Second Circuit precedent.

*In brief, beginning with timeliness:*

- The fund investments at issue have been publicly disclosed since 2022, well before the start of this case.

- The investment funds, in turn, publicly disclosed *their* underlying positions every quarter in SEC filings.

- I raised the issue of potential conflicts at the first appearance, naming one of the fund families at issue by name. And I invited questions or comments from Defendants, who indicated that they had none.

- Defendants remained silent about these alleged conflicts until after they were convicted at trial.

*And as to the merits:*

- Defendants make no claim that I had any interest — direct or indirect — in a *party* to this case.

- Defendants do not claim that I ever personally held shares in any victim, or even in any entity mentioned at trial.

- Even a *direct* interest in a victim — which I never held — would give rise to a duty to recuse only if that interest were "so substantial" as to raise questions of partiality. Defendants never claim that I held such an interest.

**United States v. Watson, Not Reported in Fed. Supp. (2024)**

2024 WL 4827734

- Defendants do not contend that any of their four named "victims" lost money or is entitled to restitution because of the charged fraud.

- Th analysis of how substantial a victim's loss is does not even apply when the interest in a victim is held through a "common investment fund." The recusal statute plainly forecloses a motion predicated on such an indirect interest, unless the judge participates in the management of the fund at issue. And any suggestion that I manage the funds at issue, or did during the pendency of this case, would be frivolous.

**\*2** As indicated, Defendants' motion was based on my indirect financial interests in the publicly traded companies that they refer to as the "Four Victims." *See* Def. Mem. in Supp. of Disqualification 19-32, ECF No. 326 ("Def. Mem."). After the government responded, Defendants shifted focus in their reply brief. There, they downplayed their reliance on my supposed financial interests, and instead highlighted a smattering of distant, attenuated, and (in some cases) non-existent connections that they labeled my "multi-layered entanglements with this case." Def. Reply Mem. 2, ECF No. 331. This newer argument, too, lacks any meaningful support in law or fact.

For these reasons and others, as discussed more fully below, the motion is denied.

### I. Background

I assume the reader's familiarity with the history of this case, and recite selected events only.

The grand jury returned the initial indictment on February 22, 2023. *See* Sealed Indictment, ECF No. 1. The case was reassigned to me the following day. That day, the government filed — at my request — a list of "Interested Individuals and Entities." *See* List of Interested Parties, ECF No. 7 (filed *ex parte* and under seal); Mar. 6 Status Conf. Tr. 5:7-10, ECF No. 29. That list named approximately 200 companies and individuals. Among those were the "Four Victims" at issue here — Goldman Sachs Group, Inc.; Alphabet, Inc. (formerly Google); LiveNation Entertainment; and JPMorgan Chase & Co. None of the investment funds at issue here appeared on the list. Defendants do not contend that any of those funds made or evaluated an investment in Ozy Media.

Indeed, Defendants do not allege that the funds had any direct connection to this case at all.

The parties' first appearance before me occurred on March 6, 2023. I began by laying out my agenda for the conference, which included a "brief discussion of where we [stood] with respect to possible conflicts" on behalf of both Watson's new defense counsel and the Court. Mar. 6 Status Conf. Tr. 4:13-5:1-6; *see also id.* at 7:7-9 (Court stating that "when conflicts surface late, it has the potential to set things back significantly and unnecessarily"). The government confirmed that they saw no conflict with respect to the new law firm appearing on Watson's behalf.[1] *Id.* at 7:14-15. I then stated:

Okay. And as I indicated, the government has filed under seal, and *ex parte*, a list of interested parties. I've been through that and I didn't see any overlap between the people and entities listed there on the one hand, and my bio on the other hand. I just want to confirm that the government doesn't see anything along those lines either....

Obviously, if you saw the name Viking in anything that would be meaningful. I think that's highly unlikely, but that's the main question perhaps. *Id.* at 7:19-8:5. (I served as Viking's general counsel until 2018.) The government confirmed that they were aware of no potential conflicts on my part. *Id.* at 7:24-8:2. I then invited questions or comments from Defendants. *Id.* at 9:7-8. Watson's counsel indicated that they had none "at this time." *Id.* at 9:9. Watson's counsel did not pursue this issue further or move to unseal the government's Rule 12.4 disclosure.

[1]    Watson has been represented by four different law firms since his initial appearance. *See* Notice of Appearance, ECF No. 9 (Covington & Burling appearing on Watson's behalf for "bail and presentment"); Notices of Appearance, ECF Nos. 18-20 (appearances by Sher Tremonte); Notice of Appearance, ECF No. 68 (appearance by Ronald Sullivan Law, PLLC); and Notice of Appearance, ECF No. 318 (appearance by Law Office of Andrew J. Frisch, PLLC). In addition, Watson and Ozy Media were represented by at least two other law firms prior to indictment. Watson's trial counsel invoked these prior representations when serious questions emerged about whether Watson and Ozy Media had complied fully with grand jury subpoenas issued to them. *See generally* Suppl. Mem. & Order 4-7, ECF No. 257.

**United States v. Watson, Not Reported in Fed. Supp. (2024)**

2024 WL 4827734

**\*3** The case proceeded for more than a year before trial, during which time the parties engaged in substantial motion practice. Watson himself moved:

- to require removal of a press release from the U.S. Attorney's website. *See* Lett. Resp. to Gov't, ECF No. 33. [2]

- to quash a grand jury subpoena that had been issued to him eighteen months earlier. *See* Mot. to Compel and Cross-Mot. to Quash, ECF No. 64. This motion came only after the government moved to compel production. *See* Mot. to Compel, ECF No. 59.

- to suppress evidence recovered from his electronic devices. *See* Mot. to Suppress, ECF No. 73.

- to dismiss the indictment for "failure to state an offense." *See* Mot. to Dismiss, ECF No. 84.

- for dismissal based on selective prosecution. *See id.* [3]

- to dismiss the case or, in the alternative, transfer it to a different district, based on pretrial publicity arising from a post announcing the case on the government's Twitter account. *See* Mot. to Dismiss or Transfer, ECF No. 130.

[2]    I concluded, in response to this motion, that some statements in the press release were presumptively prejudicial to Defendants under Local Rule 23.1(d). Nov. 6, 2023 Mem. & Order 40-41, ECF No. 96; *see* Alison Frankel, *Ozy Media Judge Dings Brooklyn Prosecutors for 'Improper' Press Release,* Reuters, Nov. 8, 2023, https://www.reuters.com/legal/government/column-ozy-media-judge-dings-brooklyn-prosecutors-improper-press-release-2023-11-08/.

[3]    Watson argued that he had been "singled out" by the prosecutors "based on their record of targeting defendants who, like Mr. Watson and his co-defendants, are non-White." *Id.* at 28.

Watson also accused federal prosecutors of "brazenly" invading his attorney-client privilege. *See* Mot. to Disqualify Counsel & Dismiss Indictment 1, ECF No. 131. On this basis, he (again) sought dismissal of the indictment or, in the alternative, disqualification of the entire prosecution team. *Id.* [4]

[4]    Watson alleged that the government had "rampage[d]" through his protected materials, "ransacked" his work product, and "trampl[ed]" on his privilege. *Id.* at 1-2. When Watson's counsel made these assertions, he was apparently unaware that the government had sought — and obtained — a privilege waiver from Ozy Media's prior counsel. *See* June 27, 2024 Mem. & Order 18-21, ECF No. 209.

For its part, the government moved to compel Watson's and Ozy Media's compliance with two grand jury subpoenas. *See* Mot. to Compel 1. Defendants' failure to produce responsive materials was only one aspect of their persistent non-compliance with legal rules and court-ordered deadlines. I granted the motion to compel, *see* July 28, 2023 Mem. & Order 1, ECF No. 81, and later observed that Defendants continued to disregard their disclosure obligations — in many cases, right up to the moment they sought to introduce responsive materials as exhibits during trial. *See* July 9, 2024 Mem. & Order 8-18, ECF No. 245.

Trial began in May 2024. After several weeks, a jury convicted both Defendants on all counts. Jury Verdict, ECF No. 256. Then, on October 25, 2024 — twenty months after their initial appearance, and with sentencing approaching — Defendants filed the instant motion. The motion centers on my investments in funds managed by Viking Global Investors LP, D1 Capital Partners LP, and Junto Capital Management LP. Def. Mem. 4-5. As noted above, Defendants do not claim that their conduct harmed these funds directly. Instead, they claim that, at various times during the indictment period and the pendency of this case, those funds held shares in at least one of the "Four Victims." [5] *Id.* at 25-27.

[5]    Given Defendants' concession that the "Four Victims" did not lose money in the charged fraud, *see* Defs.' Nov. 8 Lett. 1, ECF No. 336, it is not entirely clear that the "victim" label applies. Nevertheless, for the sake of simplicity, I adopt the nomenclature used by Defendants.

**\*4** The investments that Defendants identify are not new. In addition to appearing in my 2023 financial disclosures, they also appeared in my 2021 and 2022 disclosures. [6] *See* 2021 Financial Disclosure 4-6, ECF No. 330-1; 2022 Financial Disclosure 4-7, ECF No. 330-2. The 2021 disclosure became public on May 10, 2022, while the 2022 disclosure became public on July 7, 2023. And my prior employment at Viking

United States v. Watson, Not Reported in Fed. Supp. (2024)

2024 WL 4827734

was also well known to Defendants. For example, Defendants cite my 2018 financial disclosures to the Senate Judiciary Committee, which indicated that I was "contractually obligated" to maintain investments in certain Viking funds "for at least three years." Def. Mem. 25 (citing reporting by *Corporate Counsel* magazine in July 2018).[7]

[6] Defendants do not attach those earlier disclosures to their motion, but "[c]ourts may take judicial notice of public documents or matters of public record." *Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018).

[7] I have never been employed by either D1 or Junto.

The funds' investments in the "Four Victims" were also publicly disclosed well before trial. Defendants themselves rely on these public filings in their motion. *See, e.g.*, Def. Mem. 23 n.28 (citing Forms 13F — disclosing holdings in U.S. equities every quarter — from 2009 through 2011); *see also id.*, tbls. 2 and 3 (relying on same public filings, dating back to 2008).

Finally, Defendants of course knew which companies they solicited for investment in Ozy, without the need for the government to tell them. This would explain why prior counsel asked no questions when I raised the conflicts issue, *see* Mar. 6 Status Conf. Tr. 9:9, and did not seek unsealing of the Rule 12.4 filing.

## II. Legal Standard

A party seeking judicial disqualification must clear a high bar. There is a "strong presumption of a judge's impartiality which may only be overcome by adequate proof to the contrary." *Wiltshire v. Williams*, No. 10-cv-6947, 2012 WL 899383, at *6 (S.D.N.Y. Mar. 16, 2012).[8]

[8] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

Defendants' motion is predicated on 28 U.S.C. § 455. That provision creates two avenues to disqualification. Section 455(a) requires a judge to disqualify himself from "any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Section 455(b) then requires

disqualification in specific factual situations, including when the judge "has a financial interest in the subject matter in controversy or in a party to the proceeding." *Id.* § 455(b)(4).

The statute carves out an important exception to Section 455(b)(4)'s financial-interest provision. It provides that "[o]wnership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund." *Id.* § 455(d)(4)(i). This exception is often referred to as a "safe harbor." *See Cent. Telephone of Va. v. Sprint Commc'ns Co. of Va.*, 715 F.3d 501, 515-16 (4th Cir. 2013).

And the Supreme Court has made clear that when Section 455 specifically *limits* a recusal obligation — as the safe harbor for common-fund ownership does — the catchall proscription on apparent partiality in Section 455(a) cannot be read to contradict that limitation. In *Liteky v. United States*, 510 U.S. 540 (1994), the Court wrote:

> As we have described, § 455(a) expands the protection of § 455(b), but duplicates some of its protection as well — not only with regard to bias and prejudice but also with regard to interest and relationship. Within the area of overlap, it is unreasonable to interpret § 455(a) (unless the language *requires* it) as implicitly eliminating a limitation explicitly set forth in § 455(b). It would obviously be wrong, for example, to hold that "impartiality could reasonably be questioned" simply because one of the parties is in the fourth degree of relationship to the judge. Section 455(b)(5), which addresses the matter of relationship specifically, ends the disability at the *third* degree of relationship, and that should obviously govern for purposes of § 455(a) as well.

**\*5** *Id.* at 552–53. On that basis, as discussed below, courts agree that where the safe harbor applies, financial interests held through a common fund cannot be a basis for invoking Section 455(a).

United States v. Watson, Not Reported in Fed. Supp. (2024)

2024 WL 4827734

### III. Discussion

Defendants advance two arguments for disqualification. Invoking Section 455(a), they argue that the fund investments at issue constitute a basis on which my impartiality might reasonably be questioned. Def. Mem. 19-27 (arguing Section 455(a)). And invoking Section 455(b)(4), they argue that my investments create an impermissible "financial interest" that requires recusal. *Id.* at 27-30 (arguing Section 455(b)(4)).

Defendants' motion is flawed on several levels. At the outset, it is untimely. But it is also meritless. The challenged investments fall comfortably within the safe harbor exception to Section 455(b)(4), which precludes any reasonable perception of partiality under Section 455(a). Moreover, it is questionable whether any of the "Four Victims" actually qualifies as such for purposes of the instant analysis. Defendants do not allege that Goldman Sachs, Live Nation, Alphabet, or JPMorgan Chase lost money because of Defendants' fraudulent conduct, or that those companies would benefit from a restitution order in this case.[9] And finally, Defendants' remaining miscellaneous arguments — lobbed like so much spaghetti at a kitchen wall — do not merit relief either.

[9] Defendants do not argue the Live Nation ever considered investing in Ozy Media. Instead, the evidence established that Defendants used Live Nation's *name* to induce other investors to commit capital. At trial, the government elicited testimony that Watson had falsely represented that Live Nation was leading Ozy Media's Series D fundraising round. *See* Trial Tr. 4127:15-24, 4167:5-11.

### A. Timeliness

"It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). The timeliness of a disqualification motion is a "threshold issue," and must be "evaluated before matters of substance are reached." *Clemmons v. Comm'r of Soc. Sec.*, No. 11-cv-1645, 2011 WL 6130926, at *4 (E.D.N.Y. Dec. 8, 2011).

To assess compliance with the timeliness requirement, the court must first determine when a movant had notice of the factors underlying the disqualification claim, and then ask whether the movant sought recusal promptly thereafter. *See Apple*, 829 F.2d at 333. Under this standard, Defendants' request for disqualification is clearly untimely.

1. The Relevant Facts Have Been Public For Years

A movant seeking recusal is usually "charged with knowledge of all facts known or knowable, if true, with due diligence from the public record or otherwise." *Univ. City Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 349 & n.88 (S.D.N.Y. 2000); *see also United States v. Daley*, 564 F.2d 645, 651 (2d Cir. 1977) ("Defense counsel's protestations that he was unaware of [the judge's] previous involvement with [the defendant] are unconvincing since the facts were clearly known to [the defendant] himself and, as a matter of public record, were at all times ascertainable by counsel.").

**\*6** To be sure, the rule is more forgiving in cases involving alleged financial conflicts under Section 455(b)(4). Because "lawyers do not routinely research judges' [public] financial disclosure forms," judges "bear the principal burden of compliance with that [S]ection." *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 130-31 (2d Cir. 2003).[10] However, once a judge has disclosed the basis of a potential financial conflict — as I did at the very beginning — the parties may not plead ignorance of that basis. *Cf. Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 165, 171 (4th Cir. 2014) (finding disqualification motion untimely where the clerk of court had "issued a notice informing the parties of the judge's related financial interest" more than two years before the motion was filed).

[10] The *Chase Manhattan* court also noted that Section 455(b)(4) conflicts are "non-waivable." 343 F.3d at 129. But the fact that a motion is not waivable does not preclude an untimeliness finding. Although "untimeliness in making a motion for recusal can sometimes constitute the basis for finding an implied waiver," the fact remains that "waiver and untimeliness are distinct issues." *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000). The former involves a "renunciation ... of the right to seek recusal," while the latter involves a "failure to seek recusal when it should first have been sought." *Id.* Thus, the non-waivability of Section 455(b)

**United States v. Watson, Not Reported in Fed. Supp. (2024)**

2024 WL 4827734

(4) conflicts does not bar finding that Defendants' recusal motion was untimely.

My investments in the funds at issue here (and my prior employment with one of the fund managers) are no secret. As the government notes, my prior role at Viking is disclosed in my biography on the Court's website, and has been since I first took the bench. *See* Gov't Opp. Mem. 15, ECF No. 330. My fund investments have appeared in my annual public financial disclosures since 2021, and (as noted above) the funds themselves were publicly disclosing their own underlying holdings quarterly in SEC filings. I expressly raised my Viking relationship at the first status conference. Finally, Defendants of course knew the companies from which they had solicited investments. *Cf. Daley*, 564 F.2d at 651 (defense counsel's "protestations that he was unaware of" relevant facts were "unconvincing since the facts were clearly known to [the defendant] himself"); *HC2, Inc. v. Messer*, No. 20-cv-3178, 2022 WL 61370, at *3 n.4 (S.D.N.Y. Jan. 6, 2022) (finding a recusal motion untimely where judge's prior law firm affiliation had been "a matter of public record since [the judge] joined that firm over two decades ago.").

Notwithstanding these brightly flashing signals — and my express invitation to raise concerns about potential conflicts — Defendants now claim they only learned about the challenged investments (for timeliness purposes) on October 2, 2024, when my 2023 disclosures were published. Def. Mem. 2-3. This is not, to put it charitably, credible. I expressly notified Defendants about my relationship with Viking at the outset of this case. The challenged investments have been public for more than two years. And Defendants apparently waited another two months after obtaining my *2022* disclosure to file the instant motion. *See* Decl. of Luke Brindle-Kyhm ¶ 3, ECF No. 329-1 (stating that Defendants' investigators were "first able to access" my 2022 financial disclosures on or about August 27, 2024); *see also Apple*, 829 F.2d at 334 (motion filed one month after entry of judgment and two months after events giving rise to it was untimely). Given this timeline, Defendants cannot plausibly claim that they were unaware of this alleged conflict until October 2024.

**\*7** Indeed, the chronology here is like that in *Kolon Industries*. There, the Fourth Circuit found a November 2011 disqualification motion untimely because (1) the basis for the alleged conflict had been a matter of public record for years, (2) the defendant had been notified about the alleged conflict by the court in May 2009, and (3) the defendant obtained documents showing the potential conflict in August 2010. 748 F.3d at 171. These reasons apply here too.

Defendants invoke *Chase Manhattan* to argue that it was "not incumbent on [them] ... to search [my earlier] financial disclosure forms." Def. Mem. 20. This overreads *Chase Manhattan*. That case said the judge bears the "principal burden" of identifying potential financial conflicts. 343 F.3d at 131. But "principal" does not mean "sole." Nothing in *Chase Manhattan* permits a party to ignore years of public disclosures, and then bring a recusal motion based on a supposed conflict that plainly appears in those disclosures. *See LoCascio v. United States*, 473 F.3d 493, 497 (2d Cir. 2007) (timeliness requirement "avoids the risk that a party [will] hold[ ] back a recusal application as a fall-back position in the event of adverse rulings on pending matters"). This is especially so where — as here — the party levels no objections (and, indeed, asks no questions) in response to the judge's affirmative inquiry about potential conflicts. *See* Mar. 6 Status Conf. Tr. 7:19-24, 9:7-9. At bottom, *Chase Manhattan* is not the permission slip for willful ignorance that Defendants claim.

Defendants also elide the reasoning of *Chase Manhattan*. There, the Second Circuit partially relied on the fact that "had counsel ... examined the judge's disclosure forms existing on the date the case was transferred to [the judge], the forms *would not have shown*" the alleged financial conflict. 343 F.3d at 131 n.2 (emphasis added). In other words, a distinction between *Chase Manhattan* and the instant case is that the parties in *Chase Manhattan* could not identify the alleged conflict by reviewing financial disclosures. [11]

[11]    Indeed, *Chase Manhattan* was decided against a different disclosure landscape. It preceded the newer requirement that judges disclose certain purchases and sales on an interim basis, in addition to their annual disclosures. *See* Courthouse Ethics and Transparency Act, Pub. L. No. 117-125, § 2(a), 136 Stat. 1205, 1205 (2022).

2. The Motion Was Not Promptly Filed

To determine whether a party filed a recusal motion promptly upon learning of an alleged conflict, a court must consider "whether: (1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after the entry of judgment; and (4) the movant can demonstrate good cause for the delay." *Apple*, 829 F.2d at 334. Several circuits have established a presumption that motions made after a judgment — or even a trial verdict

**United States v. Watson, Not Reported in Fed. Supp. (2024)**

2024 WL 4827734

— are untimely. *See id.* (citing *United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986) ("We first note that a motion for recusal filed weeks after the conclusion of a trial is presumptively untimely absent a showing of good cause for its tardiness.")); *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1356 (3d Cir. 1990) (holding motions for recusal filed after entry of dismissal order untimely, because "[a]ny other conclusion would permit a party to play fast and loose with the judicial process by betting on the outcome.").

**\*8** At least three of the four *Apple* factors cut against Defendants. Defendants have participated extensively in trial and pre-trial proceedings since the alleged financial conflicts became public. Starting this case over would work a colossal waste of judicial resources. And Defendants have not shown good cause for their delay.

To be sure, Defendants' motion has not been filed after the entry of judgment. However, Defendants are seeking recusal after being found guilty at trial, which gives rise to the suggestion that they are "improperly using the recusal motion as a fall-back position to an unfavorable ruling." *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 154 (S.D.N.Y. 2012), *objections overruled sub nom. Moore v. Publicis Groupe SA & MSL Grp.*, No. 11-cv-1279, 2012 WL 12528637 (S.D.N.Y. Nov. 8, 2012); *see also LoCascio*, 473 F.3d at 497. As the Second Circuit has made clear, Section 455's timeliness requirement exists to prevent such manipulative tactics. *See In re IBM Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) ("[A] prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters.").

In sum, the recusal motion is untimely.

**B. The Merits**

Even if Defendants' motion were not untimely, it would still fail for (at least) three independent reasons. First, my investments in the four funds fall within the safe-harbor exception outlined in Section 455(d)(4)(i). Second, Defendants never show that the "Four Victims" actually were victims of Defendants' fraudulent conduct, at least in the sense that they suffered financial harm. And third, Defendants do not explain how an order of restitution could have predictably benefited any of the four funds. After addressing these points, I briefly discuss Defendants' remaining scattershot arguments.

1. The Safe Harbor in Section 455(d) Applies

Defendants' motion is squarely foreclosed by existing law. As noted above, the safe harbor in Section 455(d) excludes ownership interests in "common investment funds" from the class of financial interests that require recusal. This exception plainly applies, and it is dispositive of this motion.

Under the safe harbor, "[o]wnership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund." 28 U.S.C. § 455(d)(4)(i). The policy justification is clear. The exception "enable[s] judges to hold securities without risking recusal across a broad range of cases." *Cent. Telephone*, 715 F.3d at 515; *see also Chase Manhattan*, 343 F.3d at 128 (a "bright-line test as to equity interests" — like the safe harbor in Section 455(d) — "avoids many difficult line-drawing issues and is in that sense actually helpful to judges"); *New York City Dev. Corp. v. Hart*, 796 F.2d 976, 980 (7th Cir. 1986) (the safe harbor allows "judges to hold securities without needing to make fine calculations of the effect of a given suit on their wealth."). Indeed, if the law were otherwise, judges could not even own an index fund or retirement account without risking a torrent of disqualification motions. [12] *See Cent. Telephone*, 715 F.3d at 515; *United States v. Farkas*, 149 F. Supp. 3d 685, 698 (E.D. Va. 2016). The exception also encourages judges to hold diversified funds rather than single-name stocks. This reduces the risk of financial impropriety because the judge will find it "difficult to predict" the effects of any given ruling. *Hart*, 796 F.2d at 979.

[12] This risk is especially pronounced when the underlying investments are in large, widely held companies like Alphabet and JPMorgan Chase. *See* Martin Leetau et al., *Characteristics of Mutual Fund Portfolios: What are the Value Funds?* 3, 13 (Nat'l Bureau of Econ. Res., Working Paper No. 25381, 2021) (noting that most mutual funds invest predominantly in the stocks of large companies).

**\*9** The text of Section 455(d)(4)(i) establishes two criteria for an investment to qualify for the safe-harbor exception. The investment must be in a "mutual or common investment fund." And the judge must not "participate[ ] in the management of the fund." The investments at issue here easily satisfy both criteria.

United States v. Watson, Not Reported in Fed. Supp. (2024)

2024 WL 4827734

### a. The Funds Are Common Investment Funds

The investments at issue are in "mutual or common investment funds." Section 455(d) does not define this phrase, but the Advisory Committee on the Code of Conduct for United States Judges has offered guidance. *See 2B Jud. Conf. of the U.S., Guide to Judiciary Policy* 204 (2024) ("Advisory Op. No. 106"). To determine if a fund qualifies for the safe harbor, relevant considerations include: "(1) the number of participants in the fund; (2) the size and diversity of fund investments; (3) the ability of participants to direct their investments; (4) the ease of access to and frequency of information provided about the fund portfolio; (5) the pace of turnover in fund investments; and (6) any ownership interest investors have in the individual assets of the fund." *Id.*; *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 2023 WL 2176758, at *8 (N.D. Cal. Feb. 15, 2023)* (applying the Advisory Committee factors).

Taking these factors in turn:

***Number of participants.*** As Defendants acknowledge, the funds at issue have hundreds of investors. Def. Mem. 29 & n.30. This is consistent with common-fund status. *See* Advisory Op. No. 106 at 205 (law firm's retirement fund qualified for the exception because, among other factors, "there were a large number of participants"). Defendants have cited no authority for the proposition that funds this widely held do not qualify as common investment funds. [13]

[13]  The parties have surfaced only one case holding that the number of investors militated *against* common fund status. *See NEC Corp. v. Intel Corp.*, 654 F. Supp. 1256, 1259 n.1 (N.D. Cal. 1987) (safe harbor did not apply to an investment fund where "membership [was] limited to 24 members").

***Size and diversity of holdings.*** The funds are large and highly diversified — they manage billions of dollars and maintain scores or hundreds of positions at a given time, as a cursory glance at their public filings would indicate. *See* Gov't Opp. Mem. 12 (citing public disclosures). Defendants' arguments are misleading on this point. They first state that the funds in question "concentrate their positions in a few public stocks." *Id.* at 29. This contention is belied by the funds' quarterly (and public) filings, on which Defendants themselves extensively rely. For example, one manager's SEC filings show that it held positions in eighty-one companies at the end of Q1 2023.

*See* Form 13F, Viking Global Investors LP (May 15, 2023). And because Form 13F requires disclosure only of *domestic* shareholdings, and only long positions, that number captures a relatively small portion of the actual diversification. *See* 17 CFR § 240.13f-1(c); *Frequently Asked Questions About Form 13F*, SEC, https://www.sec.gov/divisions/investment/13ffaq (last visited Nov. 18, 2024) ("You should not include short positions on Form 13F."). [14]

[14]  Defendants assert that the funds are "explicitly employing limited diversification." Def. Mem. 29. This assertion is also inaccurate. It relies on statements about how concentrated the funds' governing documents *permit* them to be — not how concentrated they actually *are*. *See id.* at 29 n.31 (quoting an SEC filing as "allowing for up to 12% concentration in a given position"). As noted above, a quick perusal of the funds' filings demonstrates the extent of the funds' diversification. Again, that perusal would *understate* the level of diversification because Form 13F does not reveal non-U.S. holdings or short positions. In any event, even the hypothetical twelve percent concentration would not be inconsistent with common-fund status. The Second Circuit held Berkshire Hathaway to qualify for "common investment fund" status in a recent case, despite that fund permitting much greater concentration. *See United States v. Teman*, No. 21-1920, 2023 WL 3882974, at *3 (2d Cir. June 8, 2023) (summary order); *see also* John Devine & Wayne Duggan, *The Complete Berkshire Hathaway Portfolio*, U.S. News Money, Sept. 4, 2024, https://money.usnews.com/investing/stock-market-news/articles/the-complete-berkshire-hathaway-portfolio (last visited Nov. 18, 2024) ("Although Berkshire Hathaway's stock portfolio – worth about $310 billion – comprises 47 positions, it's not quite as diversified as you might expect for a grouping of that many stocks. Its top six holdings make up 71% of Berkshire's stock portfolio. *And its single largest position, Apple, makes up almost 28% of its portfolio.*") (emphasis added).

***\*10 Participants' ability to direct underlying investments.*** The ability of outside investors like the undersigned to direct the underlying investments of the funds is, simply put, zero. (Indeed, Defendants' motion dramatically overstates the level of input that a general counsel might have into stock selection

**United States v. Watson, Not Reported in Fed. Supp. (2024)**

2024 WL 4827734

*during* his employment, let alone six-plus years after his resignation.) Defendants sidestep this point, even though it is apparent on the face of filings they cite extensively.[15] *See* Def. Mem. 29. Instead, they assert only that "the funds are actively and aggressively managed, with positions changing quarter by quarter." *Id.* This misses the point: the level of "aggression" with which the funds are managed (whatever that may mean) says nothing about my — or any other outside investor's — power to direct the contents of the funds' portfolios.

[15] As their public filings make clear, the funds in question are managed by their respective management companies. Those management companies act in the interests of their clients, which are the *funds themselves* — not the ultimate individual investors in those funds. *See Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006). The brochure filed with Viking's March 28, 2024 Form ADV states, for example:

> VGI [Viking Global Investors, the management company] has defined certain investment objectives for the Funds, as set forth in their respective offering memoranda and operative documents, and tailors its advisory services to meet those objectives. *VGI is not restricted in the types of financial instruments in which it may invest on behalf of the Funds.* However, VGI monitors and manages for the Funds any internal portfolio guidelines (for example, leverage and exposure requirements for internal risk-management purposes). *These internal guidelines confer no rights on its clients or investors and impose no additional legal obligations upon VGI.*

Viking Global Investors LP, Part 2A of Form ADV: Firm Brochure 4 (Mar. 28, 2024) (emphasis added). There is no indication in the Form ADV or elsewhere that the managers at issue take direction from outside investors, and Defendants have cited none.

***Transparency into fund portfolios.*** The less extensive (and less frequent) a given fund's disclosures about its holdings, the more likely it will qualify as a common investment fund under the relevant ethics guidance. *See* Advisory Op. No. 106 at 205. And as is widely known, private funds like the ones at issue here are generally required to disclose less than the average mutual fund. *See, e.g.*, SEC Off. of Investor Educ. & Advocacy, *Investor Bulletin: Hedge Funds* 4 (2013) ("[H]edge funds are not required to provide the same level of disclosure as you would receive from mutual funds.").[16]

[16] The funds at issue are commonly referred to as "long-short equity" funds. As such, they differ from mutual funds in two important ways: they seek to "hedge" their long exposure by taking short positions, and they are compensated based on performance. Neither of these factors should have any relevance to the common-fund analysis. Nor should the funds' ability to invest in privately held, as well as publicly traded, companies.

Here, too, Defendants' brief creates an inaccurate impression. Defendants describe the availability of a "constant stream of detailed account reports" about the funds, pointing to one manager's weekly performance estimates and monthly "long equity positions reports." Def. Mem. 16-17. The weekly estimate they cite, however, contains no position-level data at all. And while the monthly report lists long positions, it only does so on a lag, and furthermore says nothing about the fund's short positions — a meaningful portion of the portfolio of a long-short equity fund. This is less transparency into fund-level positions than the average mutual fund offers.[17]

[17] Mutual funds face extensive disclosure requirements. *See* 15 U.S.C. § 80a-29 (detailing reporting requirement of investment companies governed by the Investment Company Act of 1940). Those requirements generally do not apply to private funds. *Nat. Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1102 (5th Cir. 2024).

**\*11** ***Pace of turnover in fund assets.*** The faster the pace of turnover, the greater the case for common investment fund status. *See* Advisory Op. No. 106 at 204. This is because higher turnover limits the outside investor's ability to predict the fund's underlying holdings at any given time. *See id.* (law firm retirement fund fell within the safe harbor because, among other things, "the fund's assets turned over frequently"); *cf. Hart*, 796 F.2d at 980 (where a judge holds a mutual fund containing a company's stock, the judge may still preside over a case involving that company because "the fund may sell the stock before the judge decides the case"). Defendants appear to believe that the opposite is true, so they assert that the funds' positions "chang[e] quarter by quarter." Def. Mem. 29. Thus, Defendants end up arguing (wittingly or unwittingly) *for* the safe harbor's applicability on this point.

United States v. Watson, Not Reported in Fed. Supp. (2024)

2024 WL 4827734

*Ownership of underlying assets*. Defendants do not allege that I personally hold any ownership interest in the underlying assets of the funds (and I do not). Instead, they point to disclosures in one of the fund managers' SEC filings regarding the possibility of "co-investment opportunities," *id.* at 30 n.34, but they do not suggest that I have participated in any such co-investment alongside any of the funds (and I have not).

### b. The Undersigned Does Not Participate in Managing the Funds

As noted in the six-factor analysis above, I do exercise no control over the funds. Indeed, Defendants do not allege that I make investment decisions for these funds. Perhaps realizing just how far that assertion would stretch credulity, they rely instead on implication and innuendo.

For example, Defendants point to my position as a director of the Viking Global *Foundation* to suggest that I continue to hold some sway over Viking's investment decisions. Def. Mem. 5-6. That foundation makes grants to organizations that "address systemic inequities" in early-childhood education in marginalized communities, among other priorities. [18] The board position is uncompensated, and the Foundation is a separate legal entity from the investment manager at issue. The suggestion that my service on the Foundation's board demonstrates some control over the Viking funds cannot be taken seriously.

[18] *See Viking Global Foundation*, https://vikingglobal.com/viking-global-foundation/ (last visited Nov. 18, 2024).

Thus, the safe harbor to Section 455(b)(4) applies.

### c. The Safe Harbor Eliminates Any Appearance Issue Under Section 455(a)

Because the safe harbor applies, Defendants' argument for disqualification under Section 455(a) also fails. In *Liteky*, the Supreme Court stated that limitations on Section 455(b) — like the Section 455(d) safe harbor — must apply to the 455(a) analysis as well. 510 U.S. at 552. To conclude otherwise "would cause the statute, in a significant sense, to contradict itself." *Id.*; *see also Hart*, 796 F.2d at 980 (applying Section

455(a) to conduct protected by the safe harbor "would prevent [Section] 455(d)(4)(i) from acting as a safe harbor, once again calling on judges to decide whether a financial interest is sufficiently substantial to require disqualification."); *Farkas, 149 F. Supp. 3d at 698* ("[I]t would be poor statutory construction to interpret § 455(a) as nullifying the safe harbor explicitly designated by the statute.").

However, "since the impartiality of the court has been questioned, it is important to address [Defendants'] contention on the merits." *Paschall v. Mayone*, 454 F. Supp. 1289, 1300 (S.D.N.Y. 1978). Accordingly, I proceed to address Defendants' Section 455(a) argument as well.

### 2. Defendants Do Not Allege That The "Four Victims" Suffered Financial Harm

The crux of Defendants' Section 455(a) argument is that I have indirect exposure to the "Four Victims." Therefore, the argument goes, an observer could reasonably infer that I am partial to those victims. There are two glaring problems here. First, Defendants cited no evidence that Alphabet, Goldman Sachs, Live Nation, or JPMorgan Chase lost money because of Defendants' fraudulent conduct, and they have now acknowledged that they make no such argument. Second, even if such evidence existed, my investments in those companies are too insubstantial — by orders of magnitude — to trigger disqualification.

### a. None of the "Four Victims" Suffered Financial Harm

**\*12** To claim restitution in a criminal case, an alleged fraud victim "must have endured a financial loss that was directly or proximately caused by a defendant's fraud." *United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019); *cf.* U.S.S.G. § 2B1.1, application note 1 (defining fraud "victim" as a person who "sustained any part of [an] actual loss" determined under Section 2B1.1(b)(1)). Thus, to show that any of the "Four Victims" would benefit from a restitution order, Defendants need to show that those companies lost money.

This they cannot do. Perhaps most significantly, Defendants have now acknowledged, in response to my inquiry, that none of the four companies "lost money or is entitled to restitution." *See* Defs.' Nov. 8 Lett. 1; Order, Nov. 5, 2024. This squares with the trial record. Watson's co-defendant, Samir Rao, testified that after he and Watson orchestrated the impersonation of a YouTube employee in a due diligence

call with Goldman Sachs, the Goldman investment "fell apart immediately." Trial Tr. 844:4. Rao also testified that there were "no serious discussions with JPMorgan about equity investments," *id.* at 852:14-15, and that Alphabet "did not ultimately invest" either, *id.* at 867:19-20. Watson himself admitted that Live Nation never agreed to invest in Ozy Media. *Id.* at 4157:10-12.

#### b. Any *Foreseeable* Losses to the "Victims" Were Vanishingly Small

As Defendants note, we assess recusal based on what the judge knows *ab initio*, rather than in hindsight. Thus, we might assume, *arguendo*, that in February 2023, it was plausible that the "Four Victims" expended resources in due diligence, or in response to subpoenas in this case. I need not analyze whether those assumptions would actually give rise to "victim" status.[19] Even if they did, and even if my supposed interest in those victims had been direct rather than indirect, recusal still would not be required.

[19] There is some authority suggesting that a company may seek restitution when it conducts due diligence in reliance on a defendant's fraudulent representations. *See, e.g., United States v. Gallant,* 537 F.3d 1202, 1250-51 (10th Cir. 2008) (finding that a company had been "harmed" by a defendant's fraudulent representations because, even though it did not ultimately invest in the defendant's bank, it had "incurred the expenses associated with ... performing due diligence" based on those misrepresentations). Here, however, Defendants do not contend that the "Four Victims" are entitled to restitution on that basis.

Stock ownership in a victim — as opposed to a party — does not raise an appearance of partiality unless "the extent of the judge's interest in the crime victim is so substantial, or the amount that the victim might recover in restitution is so substantial, that an objective observer would have a reasonable basis to doubt the judge's impartiality." *United States v. Lauersen,* 348 F.3d 329, 336-37 (2d Cir. 2003); *see In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) ("[W]here an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality.").

Here, the "victims" that actually contemplated Ozy Media investments have market capitalizations in the hundreds of billions or, in the case of Alphabet, in the trillions of dollars. On that order of magnitude, the hypothetical costs to those firms stemming from Defendants' fraud would be less than a rounding error. *See Lauersen*, 348 F.3d at 336-37. The Second Circuit recently opined that where a district judge held "a stake that could not be meaningfully affected by a restitution award," there was "nothing to" the defendant's argument that the judge should have recused based on his indirect investment in Bank of America (a victim). *See Teman,* 2023 WL 3882974, at *3; *see also United States v. Ravich,* 421 F.2d 1196, 1205 (2d Cir. 1970) (judge's ownership of victim bank's stock was, under the circumstances, "not merely unsubstantial but non-existent").[20] Defendants identify no contrary authority suggesting that an indirect investment in a victim suffering no — or negligible — harm requires recusal. Instead, they rely heavily on the Second Circuit's decision in *Litovich v. Bank of America Corporation,* 106 F.4th 218, 228-29 (2d Cir. 2024), a case involving a judge's spouse's ownership stake in a party, not a victim.

[20] Using Defendants' assumptions, the highest beneficial interest I had in any of the "Four Victims" during the pendency of this case was a .0015 percent share in LiveNation. *See* Gov't Opp. Mem. 20. This is smaller than the interest that the Second Circuit held insubstantial in *Ravich.* 421 F.2d at 1205 (.0072 percent stake).

**\*13** Thus, even assuming arguendo that Defendants' "Four Victims" actually are victims, Defendants still cannot show a reasonable appearance of partiality under Section 455(a).

#### 3. Restitution Would Not Clearly Benefit the Funds

Finally, even if we were to ignore all the other gaps in Defendants' motion, there would still be one last problem: There is no certainty that a restitution order in favor of the "Four Victims" would benefit the funds in which I am invested.

Put simply, any restitution award would go to the *companies*, not the funds. And the funds' positions in the companies turn over from time to time. For example, Viking's public filings reveal that while it held Alphabet shares at the end of most quarters between Q4 2019 and Q2 2021, it no longer held such shares as of Q3 2021. Viking then reported no new Alphabet position for more than two years. So, it would be impossible to predict which fund might own a stake in which victim

United States v. Watson, Not Reported in Fed. Supp. (2024)

2024 WL 4827734

company at the time restitution was ordered.[21] Basically, Defendants' restitution scenario would require the power of clairvoyance. *See Hart*, 796 F.2d at 980 ("[N]o judge with a diversified portfolio will be able to predict the effect [of a given ruling] on his wealth.").

[21]    This leaves out an additional complication, which is that funds disclose what they hold at quarter-end; Form 13F disclosures do not show the start and end dates of a position with precision.

4. Defendants' Remaining Arguments Lack Merit

In addition to invoking my financial holdings, Defendants also level a series of scattershot allegations concerning my "overlap" with, and "multi-layered connections" to, various people and entities. *See generally* Def. Reply Mem. As to several of these, Defendants invoke no legal authority to establish their *relevance*, let alone to support the claim that a given connection might justify relief. Because Defendants failed to develop these arguments in the argument section of their initial motion, they are probably waived. *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) (argument waived where "no separate heading in the argument section of the brief address[d] [the] argument"). Nevertheless, given the suggestion of partiality, I briefly address them here.

***The Foundation Board.*** First, Defendants point to my position as a director of the Viking Global Foundation. Def. Mem. 5-6. As noted above, the Foundation in question pursues child education and welfare (and related goals) through grant-making. It is not an investment advisor. It has its own legal existence, and Defendants do not indicate how or why it might be involved in the management of the funds at issue.[22]

[22]    Section 455 forecloses the contention that the Foundation's holdings could be attributed to me. *See* 28 U.S.C. § 455(d)(4)(ii) ("An office in [a] ... charitable ... organization is not a 'financial interest' in securities held by the organization.").

***"Co-Investments."*** Defendants attempt to make something out of the funds' "co-investments" with certain entities. Def. Mem. 13-14. Of all the strands of Defendants' "multi-layered connections" argument, this one is the most puzzling. To the extent I understand it, the "co-investment" argument proceeds as follows: certain victims — such as SV Angel and Clayton, Dubilier & Rice — *actually* invested in Ozy

Media (unlike the "Four Victims"). Separate and apart from their Ozy investments, those victims also held other (entirely unrelated) investments. For example, SV Angel owned shares in a company called "Color," and Clayton, Dubilier & Rice owned shares in "Covetrus." *See* Def. Mem. Ex. B, ECF No. 326-2. Those other companies — Color and Covetrus — may have nothing to do with this case. But some of the investment funds in which I participated also own (or owned) shares in those other (unrelated) private companies. Ergo, these co-investments suggest a conflict.

**\*14** It is eminently possible that I am missing something, but the logic of this argument remains elusive. The suggestion appears to be that if Person A invests in a given security, and Person B also invests in that security, we should presume some meaningful relationship between them. But Defendants suggest no reason to believe that all — or even most — funds that are "co-investing" in the same start-up company have any substantive relationship with each other *at all*, let alone one that would be legally relevant here.

***Prime Brokers.*** Defendants note that Goldman Sachs and JPMorgan Chase provided certain services — such as prime brokerage services — to Viking while I was general counsel. Def. Mem. 12-13.[23] They note a sentence (in a publicly available biography of mine) indicating that I supervised negotiations with counterparties as general counsel. *Id.* at 22-23 n.26. But Defendants never explain why my former employer's custodial or trading relationships would have any bearing on my impartiality in this case. As is widely known, broker-dealers like JPMorgan Chase and Goldman Sachs are very large, and very complicated, entities that maintain many lines of business. Defendants do not suggest that the prime brokerage function at either bank had anything to do with the events underlying this case (and one struggles to imagine why it would). Indeed, even if I *personally* relied on financial services from Goldman Sachs or JPMorgan Chase, that would not be enough to justify disqualification. *See, e.g., Harris v. Corrections Corp. of Am.*, 2022 WL 19039609, at \*1 (M.D. Fla. Feb. 24, 2022) (a judge's ownership of a bank account "does not call for recusal [even] when the bank is a litigant in a case"); *2B Jud. Conf. of the U.S., Guide to Judiciary Policy* 164 (2024) (noting in Advisory Opinion No. 94 that "[m]aintaining a bank account does not require a judge to recuse from cases in which the bank is a party").

[23]    Among certain other services, a prime broker "provides a centralized way for clearing trades and settling funds across multiple accounts held with

**United States v. Watson, Not Reported in Fed. Supp. (2024)**

2024 WL 4827734

many executing brokers who process buy and sell orders of securities." *SEC v. Murphy*, 50 F.4th 832, 839 (9th Cir. 2022), *cert. denied sub nom. Murphy v. SEC*, 144 S. Ct. 344 (2023).

***Individuals Working at Victims (and Putative Victims).*** Lastly, Defendants point to certain relationships with individuals. Among them is one Raph Posner, whom the motion identifies as general counsel of Antara Capital, another "alleged victim" of Defendants' fraudulent conduct. Def. Mem. 11-12. Mr. Posner did not testify in the case, but Antara did invest money in Ozy. Once again, the logic of this purported connection is opaque: Defendants point out that Mr. Posner once worked at another fund (that did *not* invest in Ozy) in which I was previously an investor (but was no longer, by the time this case started). The most Defendants say about the Posner relationship is that he was my "counterpart" in his role as general counsel of a different fund manager. *Id.* at 11. They do not suggest that I have ever met Mr. Posner, let alone that I have a meaningful relationship with him (and I do not recall ever meeting him). [24]

[24] When resolving a motion to disqualify, a judge may conduct his or her own investigation, and draw on his or her own recollections, to assess the significance of an alleged conflict. *See, e.g., United States v. Morrison*, 153 F.3d 34, 48 n.4 (2d Cir. 1998) (holding it was "not irregular" for a district judge to ask her spouse about his "possible involvement with the defendant"); *Thorpe v. Zimmer*, 590 F. Supp. 2d 492, 494-95 (S.D.N.Y. 2008) (finding that purchase of knee prosthetic from defendant's competitor did not create a conflict, based in part on judge's recollection that she had "no input into the selection of a prosthesis" and "did not do any independent research into various prostheses").

**\*15** The second such individual is Patrick Carroll, who was an FBI agent when I was a federal prosecutor. Defendants note — correctly — that Mr. Carroll was present at my confirmation hearing and that I spoke there of my regard for him. *Id.* at 10-11. What Defendants do not suggest, however, is that I have had any interaction with Mr. Carroll in his subsequent capacity as a Vice President of Goldman Sachs. Indeed, Defendants do not contend explicitly that Mr. Carroll was still *actually working* at Goldman during the investigation in this case. The government, for its part, has represented that it had no contact with Mr. Carroll. Gov't

Opp. Mem. 17 n.6 (confirming that "the government has no knowledge of this individual's involvement in the case").

Thus, putting aside the question of financial exposure to the "Four Victims," Defendants have collected — after what seems like a herculean effort — a small assemblage of remote, indirect, and in some cases non-existent connections between me and certain minor (at most) players in the Ozy Media saga. This is no revelation: If a judge lives long enough to have held a series of jobs and made a healthy number of acquaintances, a spaghetti chart like the one in Defendants' reply brief will not be hard to contrive. *See Reimerdes*, 104 F. Supp. 2d at 354 (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)) ("As the Supreme Court has pointed out in another context, at a sufficiently high level of generality, everything is related to everything else."). But none of these alleged connections even faintly suggests a conflict of interest. Thus Defendants' "other connections" argument is, in the end, another "case where multiple zeros still add up to zero." *United States v. Coppins*, 953 F.2d 86, 92 (4th Cir. 1991) (Niemeyer, J., dissenting). [25]

[25] In the interest of completeness, it is worth noting briefly that Defendants have mounted an extended media campaign — on YouTube, Instagram, a website of their own creation, and elsewhere — in which they accused government prosecutors of racial bias (without evidence), and then turned their attacks on the Court. *See* Gov't Opp. Mem. 1-2 (citing Too Black for Business, *23 Separate Complainants Write Letters of Judicial Complaint*, http://www.tooblackforbusiness.org/cw/cw-unfair-trial); July 23 Gov't Lett. 1-5, ECF No. 264. This, too, is no cause for disqualification. *See, e.g., United States v. Wolfson*, 558 F.2d 59 (2d Cir. 1977) (disqualification not warranted based on defendant's letter to the *New York Times* disparaging judge); *United States v. Helmsley*, 760 F. Supp. 338, 341 (S.D.N.Y. 1991) (attorney's "hostile campaign" against judge's nomination not grounds for recusal). Indeed, the Second Circuit has affirmed the decision not to recuse even in the case of physical threats against a judge. *E.g., In re Basciano*, 542 F.3d 950, 957-58 (2d Cir. 2008).

5. <u>Summary</u>

Defendants' motion for disqualification can be dismissed without recourse to the merits. But the argument fails on the merits, too. Indeed, it is — and this is a word we strive not to use lightly — frivolous. The safe harbor exception plainly

**United States v. Watson, Not Reported in Fed. Supp. (2024)**

2024 WL 4827734

applies. The alleged "victims" are not clearly victims at all. A restitution order would benefit neither me nor the funds in which I have invested. And none of Defendants' remaining miscellaneous arguments carry water. [26]

[26] Given that the motion is untimely, Defendants' request to unseal the Rule 12.4 statement, *see* Def. Mem. 19, is denied as moot. (Defendants indicate that they had emailed this request to Chambers, *see id.*, notwithstanding the Court's Individual Rules and Practices to the contrary.)

### IV. Conclusion

For the foregoing reasons, the motion to disqualify is denied.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4827734

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:23-CR-00082**<br>USA v. Watson et al | — | E.D.N.Y. | Feb. 22, 2023 | Docket |

**History (12)**

**Direct History (1)**

1. United States v. Watson ✎
   2024 WL 4827734 , E.D.N.Y. , Nov. 19, 2024

**Related References (11)**

2. United States v. Watson
   2023 WL 11952996 , E.D.N.Y. , July 28, 2023

3. United States v. Watson
   2023 WL 7300618 , E.D.N.Y. , Nov. 06, 2023

4. United States v. Watson
   2024 WL 1858199 , E.D.N.Y. , Apr. 29, 2024

5. United States v. Watson
   2024 WL 2387404 , E.D.N.Y. , May 23, 2024

6. United States v. Watson
   2024 WL 2706009 , E.D.N.Y. , May 26, 2024

7. United States v. Watson
   2024 WL 4455773 , E.D.N.Y. , May 31, 2024

8. United States v. Watson
   2024 WL 3202765 , E.D.N.Y. , June 27, 2024

🚩 9. United States v. Watson
   2024 WL 3360504 , E.D.N.Y. , July 09, 2024

   *Amended and Superseded by*

10. United States v. Watson
    2024 WL 3443459 , E.D.N.Y. , July 17, 2024

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

11.  United States v. Watson
2024 WL 3471303 , E.D.N.Y. , July 19, 2024

12.  United States v. Watson
2025 WL 510814 , E.D.N.Y. , Feb. 16, 2025

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.